J-A10045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: I.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2180 EDA 2020 |

Appeal from the Order Entered October 21, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000216-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.D., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2181 EDA 2020 |

Appeal from the Order Entered October 21, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000217-2020

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JULY 2, 2021**

D.D. (Father) appeals from the orders entered on October 21, 2020,

which adjudicated dependent his daughters, I.D., born in August 2016, and

---

[*] Retired Senior Judge assigned to the Superior Court.

K.D., born in March 2018 (collectively, the Children).[1]  After careful review, we affirm.

The record reveals that the Philadelphia Department of Human Services (DHS) first became involved with this family in February 2018.  N.T., 9/10/20, at 12.  DHS received multiple reports raising concerns regarding the Children, and it indicated[2] an August 2018 report of child abuse against Mother due to an incident involving K.D.  *Id.* at 12, 15.  In addition, DHS knew Mother to have an "active substance issue[,]" and either it or a different child protective services agency had removed other children from her care previously.  *Id.* at 15.  Critically, Father had agreed not to leave the Children with inappropriate caregivers, which included anyone with a substance abuse issue.  *Id.* at 15, 18, 32.

DHS received another report regarding the family on February 4, 2020.  *Id.* at 11-13.  On February 11, 2020, DHS social worker, Zoharmella Savoy, visited the family's home.  *Id.* at 13.  When she arrived, she knocked on the door for ten to fifteen minutes before one of the Children answered.  *Id.* at 16.  Father was absent, and the Children were under the supervision of Mother and a woman named A.H.  *Id.* at 13-16.  A.H. "alerted" Father that Ms. Savoy was at the home, and Father arrived a half hour after Ms. Savoy.  *Id.* at 14.

---

[1] The Children's mother, J.M. (Mother), did not appeal.

[2] DHS "indicates" a report of child abuse if, after investigation, it determines "that substantial evidence of the alleged abuse by a perpetrator exists[.]"  23 Pa.C.S. § 6303(a).

Father then insisted, inaccurately, that he had only been gone for ten minutes. *Id.* at 18.

As Ms. Savoy conducted her visit, she observed that the Children were "pretty disheveled." *Id.* at 21. Their hair was matted, and their hair and feet appeared soiled. *Id.* Father insisted to Ms. Savoy that he left the Children in the care of A.H., who was an appropriate caregiver. *Id.* at 20. However, A.H. indicated to Ms. Savoy that she had used Methadone, and Ms. Savoy observed that her speech was slurred, and her eyes were "low and kind of glazed over." *Id.* at 17. A.H. "seemed to nod off more than once," even while Father and Ms. Savoy were talking. *Id.* at 17, 20. Meanwhile, Mother appeared anxious, "sort[ed] through drawers," and then "got up and left through the basement." *Id.* at 14.

DHS obtained protective custody of the Children following Ms. Savoy's visit to the family's home on February 11, 2020 and filed applications for emergency protective custody on February 12, 2020. The trial court granted the applications for emergency protective custody that same day. The court conducted a shelter care hearing on February 13, 2020, after which it entered shelter care orders. On February 18, 2020, DHS filed dependency petitions. The court conducted a hearing on the petitions, which lasted two days.

On the first day of the dependency hearing, September 10, 2020, DHS presented testimony addressing the circumstances leading to the Children's placement, summarized above, as well as their behavioral issues and need for services. Ms. Savoy testified I.D. appeared to have speech delays and was

"extremely hyper." *Id.* at 22. She explained that I.D. "hits a lot. She pulls hair, [and] is unable to . . . sit still or focus." *Id.* As for K.D, Ms. Savoy testified she exhibited "very violent tantrums where she threw herself on the floor and banged her head[.]" *Id.* at 22-23. The Community Umbrella Agency (CUA) case manager, Naxara Marcelin, testified she was in the process of enrolling the Children in services at Children's Crisis Treatment Center (CCTC). *Id.* at 66. She explained, however, that the Children were not yet receiving services because their foster parent did not like CCTC and wanted to enroll them somewhere else. *Id.* at 68, 92-94, 97-98.

In addition, DHS presented testimony addressing its recommendation that Father complete a specialized parenting class. Ms. Marcelin testified that Father had identified an appropriate caregiver for the Children and completed an initial parenting class. *Id.* at 67, 78-80. Ms. Savoy testified Father was enrolled in a second, specialized parenting class, which DHS recommended he complete. *Id.* at 46-48. Ms. Savoy noted Father did not seem to "understand how to be . . . an all[-]encompassing caregiver for the [C]hildren," and that he believed his sole role was to support the Children by working while a female provided direct care. *Id.* at 22, 48. Although Father completed one parenting class, and was participating in another, DHS did not recommend returning the Children to Father's care. Ms. Marcelin explained, "we still need to ensure that [Father is] able to guide and direct the girl[s'] behavior when they're in the home. And so we need to see something more hands on than just the head knowledge." *Id.* at 67.

DHS completed its case-in-chief and rested at the conclusion of the first day of the hearing. On the second day, October 21, 2020, DHS did not call any witnesses. However, Father's counsel called the new CUA case manager, Margorie Tucker. Ms. Tucker testified Father had completed a parenting class. N.T., 10/21/20, at 9-10, 23-24. Questioning by Father's counsel suggested this was the specialized parenting class DHS recommended in September. *Id.* Ms. Tucker also testified the Children were still not receiving the appropriate services. *Id.* at 16-25, 32-34, 39, 46-47. She explained the Children's foster parent allegedly confused CCTC with another organization, known as "CCIS," and attempted to enroll the Children for services at the wrong place. *Id.* at 16, 32-34. Ms. Tucker agreed that CUA was "working with" the foster parent to enroll the Children at CCTC. *Id.* at 33.

Following the testimony, the trial court announced it would adjudicate the Children dependent. *Id.* at 57-58. The court expressed grave concerns regarding the foster parent's failure to enroll the Children in services. The court explained it did not find credible the assertion that the foster parent confused CCTC with CCIS and directed that the foster parent would need to attend the next court date and face a possible finding of contempt if she did not enroll the Children by that time. *Id.* at 58-59. The court entered orders memorializing its decision on October 21, 2020. Father timely filed notices of appeal, along with concise statements of errors complained of on appeal, on November 18, 2020.

Father now raises two claims for our review:

1. Whether the trial court erred, abused discretion and violated [Father's] due process right to notice in adjudicating the subject minors dependent with the basis being present inability predicated upon vague allegations of which [Father] was given no notice[?]

2. Whether the trial court erred and abused discretion in adjudicating the subject minors dependent based on present inability and finding placement the least restrictive environment when the adjudication and placement decision[s] were predicated solely upon vague allegations of which [Father] had no notice and which were unsubstantiated by the record, thus rendering the decision manifestly unreasonable[?]

Father's brief at 4.

We review orders in dependency proceedings pursuant to an abuse of discretion standard of review. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). We must accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. *Id.* Regarding Father's assertion that the court violated his right to due process, this raises a question of law for which our standard of review is *de novo*. *In the Interest of S.L.*, 202 A.3d 723, 729 (Pa. Super. 2019).

The Juvenile Act governs dependency proceedings. *See* 42 Pa.C.S. §§ 6301–6375. The Act provides a trial court may adjudicate a child dependent if it determines he or she meets the requirements of one of ten definitions listed at Section 6302. Here, the court adjudicated the Children dependent pursuant to the first of these definitions, which describes a dependent child as lacking "proper parental care or control, subsistence,

education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302(1).

If a trial court determines a child is dependent, it must then enter an appropriate dispositional order. 42 Pa.C.S. § 6341(c), 6351(a); Pa.R.J.C.P. 1409(A)(1), 1509(D), 1515. The Juvenile Act and our Rules of Juvenile Court Procedure provide a court may remove a child from a parent's home if it finds that remaining in the home would be contrary to the child's "welfare, safety or health[.]" 42 Pa.C.S. § 6351(b)(1); Pa.R.J.C.P. 1514(A)(1). In addition, our case law instructs that a court may remove a child from a parent's home "only upon a showing that removal is clearly necessary for the child's well-being. . . . [C]lear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible." *In re A.B.*, 63 A.3d 345, 349-50 (Pa. Super. 2013) (quoting *In the Interest of K.B.*, 419 A.2d 508, 515 (Pa. Super. 1980)).

It is important to acknowledge that a parent has the right to due process in any dependency proceeding involving his or her child. *See*, *e.g.*, *In the Interest of Jones*, 429 A.2d 671 (Pa. Super. 1981). However, the parent's right is not without limitations. *See S.T. v. R.W.*, 192 A.3d 1155, 1161 (Pa. Super. 2018) (quoting *In re Adoption of Dale A.*, *II*, 683 A.2d 297, 300 (Pa. Super. 1996)) ("'Due process is flexible and calls for such procedural protections as the situation demands.'"). "'[P]rocedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend

oneself before a fair and impartial tribunal having jurisdiction over the case.'" *Id.* at 1161 (quoting *J.M. v. K.W.*, 164 A.3d 1260, 1269 (Pa. Super. 2017)).

Because Father's claims on appeal are interrelated, we will address them together. Father argues in his first claim that the trial court violated his right to due process by adjudicating the Children dependent based only on "vague allegations of which [he] was given no notice." Father's brief at 15. Father contends that the averments DHS included in its dependency petitions did not match the evidence DHS ultimately presented during the hearing. *Id.* at 15-20. Specifically, he maintains DHS averred in its petitions that the Children were dependent because he left them with inappropriate caregivers, but that the court adjudicated the Children dependent because of behavioral issues, which the petitions did not allege. *Id.*

In his second claim, Father summarizes the testimony presented during the hearing and contends the trial court's decision to adjudicate the Children dependent and remove them from his home was unreasonable and contrary to the evidence. *Id.* at 20-28. Father asserts that he identified an appropriate caregiver for the Children, that he completed two parenting classes, that any necessary services could have been implemented in his home, and that the Children's foster parent impaired his ability to achieve reunification. *Id.* at 28-29.

The trial court did not issue a written opinion in support of its decision to adjudicate the Children dependent but instead issued a statement directing

our attention to its comments on the record at the conclusion of the hearing on October 21, 2020.  The court explained its decision as follows, in relevant part:

> THE COURT: The record reflects that services were implemented to prevent placement, including a safety plan. Various witnesses testified to the girls' behavior and delays. Notwithstanding an abundance of services, the [C]hildren were found not to be safe in the home.  The testimony reflects [M]other's active drug use with no evidence of treatment.  The record also reflects that [F]ather does not understand the special needs of the [C]hildren, nor how to guide and direct them.  It reflects [F]ather's position that it's [his] role to be a provider and that childcare is the role of a woman.
>
> As counsel pointed out, the lack of therapy may have [led] to a worsening of the girls' behavior.  I am extremely concerned that services have not been implemented to date.
>
> This [c]ourt, based on the testimony presented, orders the [C]hildren to be adjudicated dependent and committed to [DHS] based on present inability.  Father is to engage in CCTC and PriCARE[3] when appropriate.  Visits are to be supervised at the agency, modifiable by agreement.
>
> . . . . Father is to provide documentation of his parenting classes.
>
> Children are to go to CCTC or . . . receive other trauma services as appropriate forthwith.  If these services are not implemented the foster mother is to appear at the next court date.
>
> CUA, you should be aware that this [c]ourt is considering a rule to show cause to find her in contempt.  It should be made clear to any foster parent that they are in no way meant to thwart any services that this [c]ourt orders.

_____

[3] The record is not entirely clear on the purpose of the PriCARE program but indicates that it is a service CCTC offers, and that CUA recommended it so that Father "can engage with the girls and help with the services that they need."  N.T., 10/21/2020, at 22, 36.

\* \* \*

THE COURT: I do not find it credible that there was a confusion about the names of services. . . .

\* \* \*

[Mother's counsel]: . . . . Would the [c]ourt consider, given again that this petition was filed back in February, 2020, and the overarching principle of the Juvenile Act is to preserve the unit of the family whenever possible, to adjudicate today but rather to permit supervision in [F]ather's home[?] There's a lot of concern about [F]ather's ability to direct and guide --

\* \* \*

[Mother's counsel]: . . . . Because the testimony was that [F]ather has stable employment, appropriate housing, that there's a plan for an appropriate caregiver while [F]ather's at work. And it seems the optimal way to service this family, to ensure that [F]ather learns the skills to really direct and guide these children is to utilize those skills and work with the [C]hildren, and that already this family has been separated for many, many months. And again --

THE COURT: Counsel, I hear your argument. However, the record does not support that. In addition to which, part of the delay is that counsel for parents have requested at least two continuances, which delayed the matter until today. At this time --

[Mother's counsel]: (inaudible)

THE COURT: Counsel, Counsel, Counsel. At this time I am not ordering a [parenting capacity evaluation] inasmuch as if I were to order one I would want the results of the therapy that the [C]hildren were involved in to be included. And since that has not taken place I will consider [an evaluation] some time in the future if it is appropriate.

N.T., 10/21/20, at 57-60.

At the outset, we reject Father's claim he did not receive adequate notice that DHS intended to pursue allegations regarding the Children's behavioral issues during the dependency hearing. Father waived this claim by failing to include it in his concise statements. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]ssues not included in an appellant's . . . concise statement of errors complained of on appeal are waived.").[4]

Even if Father had not waived this claim, our review of the dependency petitions reveals DHS included averments as to Father's failure to address the Children's behavioral issues. The petitions state:

> On February 4, 2020, DHS received allegations that [the Children] exhibited self-harming behaviors; that they were in need of constant supervision; that [I.D.] had hit [K.D.] in the face; that [Father] failed to redirect [I.D.] when she hit [K.D.]; and that the home had been seen to be in poor condition in the past.

Dependency Petition (I.D.), 2/18/20, at ¶ 5(f); Dependency Petition (K.D.), 2/18/20, at ¶ 5(f). DHS's testimony at the hearing appeared to address these averments. *See* N.T., 9/10/20, at 22-23 (Ms. Savoy testifying regarding I.D.'s

---

[4] In his concise statements, Father indicates he does not yet have access to transcripts of the dependency hearing, and, therefore, "reserves the right to expand and/or supplement this [c]oncise [s]tatement, and to raise additional issues in Appellant's Brief[.]" Concise Statement (I.D.), 11/18/20, at ¶ 5; Concise Statement (K.D.), 11/18/20, at ¶ 5. The absence of a transcript does not permit a party to avoid waiver simply by "reserving the right" to raise additional claims later. Pa.R.A.P. 1925(c)(2) provides, in relevant part, "Upon application of the appellant and for good cause shown, an appellate court may remand in a civil case for the . . . amendment or supplementation of a . . . [s]tatement[.]" Father did not comply with this procedure.

tendency to "hit[] a lot" and K.D.'s "very violent tantrums where she threw herself on the floor and banged her head[.]").

It is also important to add that DHS presented its case-in-chief, in its entirety, on September 10, 2020, and then rested. Father did not begin his case-in-chief until the hearing resumed on October 21, 2020. Accordingly, to the extent Father was unaware DHS intended to focus so much of its attention on the Children's behavioral issues during the first day of the hearing, he had well over a month to prepare and address those issues on the second day.

Moreover, Father's assertion that the trial court adjudicated the Children dependent based solely on behavioral issues trivializes the significant evidence DHS presented against him demonstrating that he knowingly endangered the Children's safety. The record reveals Father agreed not to leave the Children with inappropriate caregivers but then left them with Mother, an indicated child abuser and substance addict, and A.H., who appeared to be under the influence when Ms. Savoy arrived at the home in February 2020. Father was also dishonest with Ms. Savoy, claiming that he was gone for only ten minutes, when Ms. Savoy had observed Father to be absent for significantly longer than that. Combined with the other concerns in this case, including the Children's behavioral issues and their disheveled appearance when they entered foster care, it was within the court's discretion to conclude the Children lacked proper parental care and control pursuant to Section 6302(1), and that it was clearly

necessary to remove them from the home. 42 Pa.C.S. § 6302(1); **A.B.**, 63 A.3d at 349-50.

While Father now contends on appeal that he has already remedied the basis for the Children's removal, this argument is meritless. Father maintains, in essence, that the trial court was obligated to accept that he corrected his significant parenting deficits, and that they would not reoccur, simply because he had gone through the motions of identifying an appropriate caregiver for the Children and completing parenting classes. Given the severity of Father's misconduct, the family's lengthy history with DHS prior to the adjudication, and the potential risk of harm to the Children if the court were to return them to Father's care immediately, we see no basis to disturb the court's decision that ongoing foster care and a gradual return to Father with court supervision was the appropriate result in this case.[5]

Based on the foregoing analysis, our review of the record confirms that the trial court did not violate Father's right to due process. Our review also supports the court's conclusion that the Children are dependent pursuant to

---

[5] To the extent Father proposes the trial court should not have adjudicated the Children dependent because their foster parent failed to enroll them in services at CCTC, we reject that argument as well. If a trial court determines that children are unsafe in their parents' care, the court should not return the children to that unsafe environment simply because they happen to reside with an uncooperative foster parent. Here, the court was aware of the foster parent's recalcitrance and took reasonable steps to address it by directing that she would need to attend the next court date if she continued failing to enroll the Children in services.

Section 6302(1), and that it was clearly necessary to remove them from the home. Because Father's claims do not warrant relief, we affirm the court's October 21, 2020 orders.

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/2/2021